## Lyman *et al. versus* The City of Philadelphia.

## The City of Philadelphia *versus* Lyman *et al.*

1. A sale for taxes without description, circumstance or name having any known relation to the land is bad.

2. The land must in some way be identified from something appearing in the assessment.

3. The assessment of lands is a matter resting upon the written evidence found or once existing in the commissioners' office.

4. The return constitutes the evidence of assessment.

5. On the subject of assessments, books, documents, &c., from the commissioners' office, showing their proceedings in relation to the land, should be received in evidence.

6. Land sold to the commissioners for taxes was redeemed. Evidence of payment of taxes by the owner afterwards was not admissible against a *bonâ fide* vendee of the commissioners, purchasing in ignorance of the redemption.

7. Until a witness state his own knowledge of another's general good reputation, he cannot say he would believe him on oath.

November 4th 1867, at Pittsburg. Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

These were two writs of error, one by each party, to the judg-

ment of the Court of Common Pleas of *Schuylkill county*, in an action of ejectment brought the 6th of January 1861, by Sarah A. Cochran against the City of Philadelphia, for a tract of 401 acres 57 perches of land, situate partly in Mahanoy (formerly Rush) township and partly in Butler (formerly Barry) township. The plaintiff subsequently to the issuing of the writ sold to Daniel Miller, who was, October 27th 1863, substituted as plaintiff.

The case was tried and a verdict rendered for the plaintiff, the judgment on which was reversed, and a new trial awarded (13 Wright 440).

Miller afterwards sold to John C. Lyman, Edward Brooke, George Brooke and Seyfert, McManus & Co., who at the trial were substituted as plaintiffs. The plaintiffs gave in evidence a warrant to James Trembel, dated February 11th 1794, for 400 acres of land in Berks county, adjoining lands granted to Richard Whitehead ; also survey on the 9th of June, in the same year, to James Trembel, for 401 acres 57 perches, and allowance adjoining Richard Whitehead, &c., returned September 3d in same year; also warrants of February 11th 1794, to Richard Whitehead, Robert Whitehead adjoining Richard Whitehead, Henry Miller adjoining Robert Whitehead, and Sarah Moore adjoining Henry Miller, each warrant being for 400 acres.

The plaintiffs then offered :—

1. "The triennial assessment of Rush township for the year 1826, for the purpose of showing an assessment and the location of the James Trembel survey as unseated land ; also, the assessment and location of the surveys belonging to the same block of surveys and adjoining the James Trembel, in the names of Sarah Moore, Henry Miller, Robert Whitehead and Richard Whitehead, and all owned by James Wilson, in connection with other evidence, to show that the territory embraced by the above-mentioned surveys formed part of Schuylkill township until 1824, when it was annexed to Rush township ; that the triennial assessment for 1826 of that part annexed to Rush, was the first triennial assessment after said annexation, and includes all the above Wilson surveys, which fell into Rush township by the annexation in 1824 ; that the assessor and the assistant assessors for 1826 assessed the above-mentioned tracts as adjoining each other in the order following, as unseated land, and for the exact quantity each survey contains at the same valuation, but not all in their true Christian names, viz.: the Sarah Moore as the *Adam* Moore, 400 acres 57 perches ; Henry Miller as the *George* Miller, 402 acres ; Robert Whitehead, 400 acres ; Richard Whitehead, 401 acres ; and James Trembel as *John* Trembel, 401 acres, and so returned them into the commissioners' office ; and that the clerk to the commissioners (Jacob Hammer, who is now deceased), in transcribing the assessment for that year, changed the name from

[Lyman *v.* City of Philadelphia.]

Trembel to Turnbull; and after the name was changed from Trembel to Turnbull by the clerk of the commissioners in 1826, the tract was assessed by the assessors and taxed by the commissioners as the John Turnbull tract, in connection with the aforesaid tracts, in the same order it occupied before said change was made, and was known in the commissioners' office by that name; was so assessed in 1827, 1828, 1829, 1830 and 1831, in company with said adjoining tracts, and was sold by the treasurer to the commissioners in 1832 by that name, and again sold by the commissioners by that name in 1849, and was not known by any other name after the change of the name by the commissioners' clerk. The name 'John Turnbull' had become identified with the tract surveyed in the name of James Trembel from that time forward."

2. "The assessment and return of the road taxes of Rush township, for the years 1829 and 1830, on the John Turnbull tract, to show that it was sold in 1832 for said taxes."

3. "Four certificates from the surveyor-general, of diligent searches made upon the books and among the records in his department, that there is but one warrant for land in Berks in the name James Trembel, and that there is no warrant in the name of James Trembel for land in Northumberland, Columbia or Schuylkill counties; and that no warrant ever issued in the name of John Turnbull, for any land in either of the above-named counties."

4. "Four warrants and surveys, dated 11th February 1794, to Sarah Moore, Henry Miller, Robert Whitehead and Richard Whitehead, to show the location and identity of the James Trembel."

These offers were severally objected to by the defendant, but admitted, and bills of exception sealed. They constitute the defendant's first four assignments of error.

The plaintiffs gave in evidence the assessment of Rush township of 1826, of unimproved land in names of *John Trembel,* and the others as stated in their offer.

Also "Commissioners, 1826."

Turnbull, John, 401 acres, at 25 cents,  .  $100.25 .
   Tax  .  .  .  .  .  .  .      30."

Also the other names as above;—with the same tax.

Same for 1827, 1828, 1829, 1830 and 1831; except that Miller is omitted in all, and Richard Whitehead in 1831.

Also road-tax 1829, Rush township,
   "Turnbull, John,  .  .  .  .  .      .30."
      Road-tax 1830,
   "Turnbull, John,  .  .  .  .  .      .45."

[Lyman v. City of Philadelphia.]

. Also sale of unseated lands, Rush township 1832, from treasurer's sale-book :—

" 400 acres, Turnbull, John, taxes due $1.65, sold to commissioners."

Also deed from treasurer to commissioners, " for 400 acres in Rush township, surveyed to ———, owned by ———, sold as property of John Turnbull for county tax, 90 cents, road tax, 75 cents equals $1.65;" acknowledged June 14th 1832, recorded November 6th 1861. Also deed dated August 13th 1849, from the commissioners to Sarah A. Cochran, for 400 acres of unseated land in Rush township, surveyed to ———, owned by John Turnbull, for $1; recorded November 6th 1861. Also certificates of surveyor-general—that there is but one warrant in the name of James Trembel in Berks county; that there is no warrant in the name of James Trembel or John Turnbull in Columbia county; that there is no warrant in either name in Schuylkill county, and that there is " no warrant in name of John Turnbull in surveyor-general's office in counties in his department."

Schuylkill county was erected in 1811 out of Berks and Northampton counties. Columbia county was erected in 1813 out of Northumberland county.

Allen Fisher, a witness, called by plaintiffs, testified that the Richard Whitehead, David Evans, Mary Strembeck, John Reese, Richard Stephens and George Flower warrants surrounded the James Tremble; and that it is situated partly in both Butler and Mahanoy townships; that he had known the above block, including Trembel, as Wilson's surveys; that he never knew the James Trembel by any other name; there was an assessment in the name of John Turnbull, which he supposed referred to the Trembel; he had heard it called Turnbull by surveyors and others, but only in conversation with reference to that assessment.

Plaintiffs then gave in evidence warrants dated February 11th 1794, to Sarah Moore, Henry Miller, Robert Whitehead and Richard Whitehead for 400 acres each, and surveys on 7th and 8th of June in the same year. They then gave in evidence eight deeds, dated September 12th 1817, from the Commonwealth to Hezekiah Boone, for tracts under warrants dated January 10th 1794, to John Blackey, Thomas Pascall, William P. Brady, Thomas Grant, Samuel Scott, John Brady, Joseph Pascall and Nathan Beach respectively.

Also, that the executors of Boone, on the 19th of December 1868, conveyed an undivided half of six of the above tracts (including the Thomas Grant and Samuel Scott, and omitting the Joseph Pascall and Nathan Beach) to John Schall; that Schall conveyed the same to Daniel J. Rhoads, January 22d 1829. It was admitted that so much of the James Trembel as lies within

[Lyman *v.* City of Philadelphia.]

Butler township is within the lines of the Thomas Grant and Samuel Scott surveys.

The assessments for Barry (now Butler) township of "Non-Residenters" for 1833, 1834, 1835, show assessments in the name of Rhoads and Boone for 900 acres at $2—$1800.

The treasurer's sale-book of Barry township shows a sale for taxes of 900 acres, in the name of Rhoads and Boone to the commissioners, on the 13th of June 1836, and deed to them from the treasurer, July 16th 1836. The commissioners sold the same tract to Joseph Mitchell, on the 25th of April 1843, for $1.50. The deed was dated August 6th in the same year, and recorded April 26th 1852. On the 12th of February 1847 Mitchell conveyed to Sarah A. Cochran "half moiety of 900 acres, Barry township, sold by commissioners as property of Rhoads and Boone." This deed was recorded February 2d 1858. The plaintiffs, after showing conveyances tracing Sarah A. Cochran's title to themselves, rested.

The defendants traced title to the above-mentioned eight tracts, which were known as Morris lands, from the Commonwealth, through Rhoads and Boone, to Stephen Girard, on the 13th of April 1821, who by his will, proved December 31st 1831, devised them to the city of Philadelphia in trust. They gave in evidence also, warrant, September 1st 1787, to Richard Stephens, and survey, November 28th 1787, and return, November 5th 1805, for 450—warrant, November 19th 1793, to Peter Yoh, survey, June 4th 1794, and resurvey October 6th 1829 for 400 acres.

Also, patents, January 4th 1788, to Jacob Foust for tracts warranted to George Flower and Conrad Mertz. They gave evidence that about 270 acres of the Richard Stephens tract lies over the William P. Brady, Thomas Pascall and Thomas Grant; 310 acres of the Yoh over John Blackey and Thomas Pascall; all the Flower lies under the William P. Brady and Thomas Pascall; 200 acres of the Conrad Mertz under the Blackey; 1760 acres of the Boone tracts lay in Mahanoy and 416 in Barry, exclusive of that covered by the Stephens tract; 120 acres of the Stephens in Butler and 150 acres in Mahanoy are on the Boone lands, and more than half of Trembel lies in Butler.

The defendants gave in evidence the transcript for Rush (now Mahanoy) township for 1829, viz.:

"Seated List.

| | | |
|---|---|---|
| Schall, John, 800 acres, at $1, | . . | $800.00 |
| 1 Saw-mill, | . . . . . . | 15.00 |
| Tax, . . . . . . . | | 2.45" |

With entry on margin, "Rhodes & Boone."

Also, "Sales Book, Treasurer's Office, 1832, Rush township, 2300 acres, Schall, John, now Rhoades & Boone, sold to George

[Lyman v. City of Philadelphia.]

Rahn,—taxes due, $6.72,—redeemed by city of Philadelphia, April 17th 1834."

Also, " Return of 1828, Rush township; road tax on unseated lands :

    Schall, John, Mahanoy lands, tax  .    .    $4 27."
        " Sold."

Remarks.—This tax of 1828, and county tax 1829, $2.45, make " $6.72, amount for which sale above was made."

Also, transcript for Barry (now Butler) township for 1829, 1830 and 1831, each year,

    " Schall, John—Rhoades & Boone—900 acres ; tax, $5.04."

Also, return of road tax for same township,

    " John Schall, now Rhodes & Boone, tax for 1829, $8.82; for 1830, $10.08.

Also, treasurer's sales book, Barry township, 1832, " 900 acres, John Schall, now Rhodes & Boone, taxes due, $34.02 ; sold to commissioners for $37.65, 11th June 1832.   Redeemed by city of Philadelphia, April 17th, 1834."

In order to identify the assessment—" 800 acres, 1 saw-mill"—the defendants gave evidence that Boone built a saw-mill in 1826 on the Beach tract.

They then gave in evidence from the minute-book of the county commissioners of February 29th 1840, this minute :—

" At a special meeting of the board of commissioners, present, Edward Conner and George Seitzinger, (Benjamin Pott had notice, and was requested to attend, but not present), the mayor, aldermen and citizens of Philadelphia being desirous of paying the taxes due on the unseated lands belonging to the said corporation in Schuylkill county, which were late the property of Stephen Girard ; and it appearing that some portion of the lands are situated in Columbia county, and are taxed there ; and it also appearing from the records that some of the lands have been sold twice, if not three times, on the same day for the same tax : Therefore,

" Resolved, That the county treasurer be authorized to receive of the mayor, aldermen and citizens of Philadelphia, the sum of one thousand three hundred and twenty-two dollars and forty-four cents, in full, for all taxes, costs and interest required to redeem the said lands, and to pay all taxes assessed and now demandable thereon, and that on payment thereof, the commissioners will reconvey the lands purchased in for the county to said corporation."

Also, from the county treasurer's cash-book :—

" By cash received of the mayor, aldermen and citizens of Philadelphia, by hands of C. Loeser, Esq., in full for taxes on their lands, agreeably to resolution of the commissioners, passed

the 29th February 1840, authorizing treasurer to receipt for the same, $1322.44."

Also, deed dated November 16th 1848, Joseph Mitchell to Griffith Slack for 900 acres in Barry (Butler) township, (sold by commissioners as Rhodes & Boone, *supra*). Deed, Griffith Slack to Mayor, &c., of Philadelphia for the same 900 acres, for the consideration of $1200, with receipt for consideration dated March 18th 1851, and recorded same day.

Also, release endorsed, Mitchell to the city of all his title to the 900 acres, dated and recorded March 18th 1851, with evidence that Mitchell had received from the city $200 for his title.

The defendants then offered assessments from 1834 to 1849, to show that during the time the tax titles under which plaintiffs claim was held by the commissioners, the land was assessed to the defendants or those under whom they claim, and that the taxes were paid;—for the purpose of estopping the vendees of the commissioners from claiming title, &c.

On objection by the plaintiffs, the offer was overruled, and a bill of exceptions sealed for the defendants; this was the defendants' 5th assignment of error.

The plaintiffs, in rebuttal, offered certified copies of twenty-seven deeds, dated July 16th 1836, from the treasurer to the commissioners for lands sold for taxes, with conveyances endorsed to the city of Philadelphia, dated September 28th 1840, for the purpose of showing what land the city redeemed under the resolution of February 29th 1840, and that they did not redeem the tract in dispute. They also offered to prove by A. K. Whitner that he made a calculation of the taxes upon the twenty-seven lots, in connection with the statement and receipt of the treasurer and a statement of Mr. Loeser, attorney for the city, &c., to show that the amount due by the city on the lands redeemed was greater than that paid, &c.

These offers were severally objected to by the defendants; but the evidence was admitted and bills of exception sealed for the defendants, which constituted their 6th and 7th assignments of error.

The plaintiffs gave in evidence copies of the twenty-seven deeds and the calculation of Mr. Whitner, making the amount due by the city $1759.45. They then called Jacob Huntzinger, who had been treasurer of Schuylkill county in 1840; he testified that Mr. Loeser, the attorney of the city, gave him a statement of all the city lands with the list of warrants and vouchers and the number of acres in each, and the witness made a list of all the taxes due on the warrants; on some warrants he found no taxes and left them blank on the statement; that witness wrote at the bottom of the statement, as dictated by Mr. Loeser, this receipt:

"Received, Orwigsburg, March 7th 1840, from the Mayor, Aldermen and Citizens of Philadelphia, by the hands of C. Loeser,

[Lyman *v.* City of Philadelphia.]

Esq., one thousand three hundred and twenty-two dollars and forty-four cents, in full for all taxes on the lands above mentioned, agreeably to a resolution of the commissioners, passed the 29th February 1840.          "JACOB HUNTZINGER, Treasurer."

A copy of the statement was given in evidence; it is headed : "Amount of taxes assessed on unseated lands in Schuylkill county, late the property of Stephen Girard, deceased, and now the property of the Mayor, Aldermen and Citizens of Philadelphia." Of the tracts on the list to which there are no taxes charged are the Thomas Pascal, William P. Brady, Nathan Beach and Thomas Grant, which interfered with the Trembel tract.

The plaintiffs then offered "The original preamble and resolution," in the handwriting of Mr. Loeser (deceased), with the statement accompanying it of expenses, numbers opposite each item, &c., and called F. P. Dewees, the son-in-law of Mr. Loeser, who testified that he had access to his papers; that he made search for the statement and payment of city taxes in 1840; there were no papers filed under the head "City of Philadelphia;" he found no receipt such as he was requested to look for; there was such a mass of papers and in such confusion, it was possible it might be there."

Being recalled, the witness said: "This paper I found among the papers of Mr. Loeser, it is in the handwriting of Mr. Loeser; I found this two or three weeks since; I found this paper among a lot of loose papers."

The paper produced had three columns, one containing 20 numbers, apparently numbers of lots, and seven names,—the second, "Expenses of Sale;" the third, "Interest;"—the expenses and interest were footed up $220.84; then the numbers and names of four tracts said to have been sold a second time for taxes, being partly in Columbia county, and taxed there.

Then followed a rough draft of a minute for the commissioners, with much erasure; also the draft of a deed from the commissioners, with blanks and erasures.

The defendants objected to the evidence, but it was admitted, and a bill of exceptions scaled. This was the defendant's 8th assignment of error.

The plaintiffs also offered to prove by Griffith Slack that he received no consideration for his conveyance to the city; that all the consideration was paid to Mitchell; that the deed from Mitchell to him was without his knowledge, &c., to show that Mitchell was the actual owner of the land; to be followed by evidence that when the purchase-money was paid by the city to Mitchell, he informed their agent that he had sold one-half the land to Sarah A. Cochran.

The defendants objected to the evidence, but it was admitted,

[Lyman *v.* City of Philadelphia.]

and a bill of exceptions sealed, which was the defendant's 9th assignment of error.

The plaintiffs then called William Hoff, who testified that the agent of the city had notice of the deed to Sarah A. Cochran, and also that S. B. Fisher, who purchased this tract for the city, had such notice.

The defendants then offered to prove by Mr. Olmstead, solicitor of the city, that he examined Mitchell's title, advised the city to buy it, employed S. B. Fisher to buy it, and told him that he would give him $1500 if he would get it; that Fisher bought in his own name, and assigned the agreement to the city, March 18th 1851; that witness remained in Pottsville to attend to the receipt of the deed till March 18th, and he and the agent of the city in Schuylkill county took it to the recorder's office at Orwigsburg; that no search was made for the record of a deed to Mitchell; that witness never heard of deed to Sarah A. Cochran; that he had never heard that the agent of the city was with Fisher when he made the purchase from Mitchell; to be followed by the agreement with Fisher, in rebuttal of William Hoff.

The court allowed witness to prove his agency in the purchase of the Mitchell title, his employment of Fisher, his remaining at Pottsville during the negotiations, his taking the deed to be recorded, and that no search of the records was made, and said: " The agreement and assignment are the best evidence. We sustain the objections so far as they do not conflict with this ruling." A bill of exceptions was sealed for the defendants, which was their 10th assignment of error.

The defendants then called a number of witnesses, who testified that William Hoff's character for truth was not good.

The plaintiffs, to rebut the testimony as to Hoff's reputation for truth, called C. L. Pinkerton, who testified that he had known Hoff fifteen years, and had never heard Hoff's reputation questioned before this case, except by persons connected with him in business.

The plaintiffs then proposed to ask witness if he would believe Hoff upon oath, judging from the knowledge he has of his general reputation for truth. On objection by the defendants, the court would not allow the question to be put, and sealed a bill of exceptions, which was the plaintiffs' 1st assignment of error.

The plaintiffs' positions were :—

1. That the sale to the county commissioners in 1832 of the 400 acres in Rush township for taxes, assessed in the name of " John Turnbull,"conveyed the title to the whole of the land in dispute.

2. That the sale to the commissioners in 1836 of 900 acres in Barry (Butler) township, for taxes assessed in the name of Rhodes & Boone; the sale by the commissioners of the same

land to Joseph Mitchell ; the sale by Mitchell of the "half moiety" of the land to Sarah A. Cochran, and the conveyance from her and her successors, passed the title to half of the tract lying in Butler township.

The defendants' positions were :—

1. That they had the older title for the eight tracts of the "Morris lands," on some of which the Trembel survey was laid.

2. That they redeemed the land in dispute from the tax titles under which the plaintiffs claim, in pursuance of the resolution of the county commissioners of February 29th 1840.

3. That the whole Mitchell title passed to them by the conveyance from Slack and release of Mitchell of March 18th 1851.·

The plaintiffs submitted several points on which they asked the court to charge ; the questions involved in them so appear in the opinion of the Supreme Court as to make it unnecessary to give them.

The defendants submitted sixteen points.

The 13th was : "The testimony of Jacob Huntzinger, Jr., and his receipt as treasurer, under the resolution of the commissioners, in 1840, prove a perfect redemption of all the lands of the city then held by the county, no matter in what name assessed and sold ; and it is not material whether the county received more or less than enough to pay the taxes due. The county commissioners had power to make corrections and allow exonerations, and having had notice of the names of all the city lands, including the four tracts covered by the Trembel survey, and having, through the treasurer, receipted for all taxes then due upon said lands, it would be a fraud upon the part of the county, afterwards to sell any of said lands for taxes due prior to 1840, and, therefore, the plaintiffs cannot recover."

The court (Ryon, P. J.) affirmed the point, if the jury found the facts as stated in it.

The 14th was : "The presumption is, that the county commissioners performed their duty at the time of the redemption of the city lands, in 1840, and that they did receive all the taxes, costs and interests then due by the city ; and the counsel of the city having called upon the county officers to pay all taxes due upon any of the city lands, and the county commissioners having fixed the amount necessary to redeem said lands, and to pay all taxes due upon them, and having received such amount from the city, and placed the evidence thereof upon the records of their office, they could not afterwards sell any tax-title held by them at the date of said redemption, and, therefore, both the sales of 1848 and 1849 are illegal and void, and the plaintiffs cannot recove

The court answered : "Whether this was a redemption or not, of the whole of the city lands, is a question for the jury. If

6 P. F. SMITH—32

the jury find it was a redemption of all their lands, this point is affirmed."

The court also charged: "The redemption of the Scott, Brady and Grant tracts would be a redemption of the land covered by the James Trembel from the sales in 1832 and 1836 to the com- missioners, and destroy the title of the plaintiffs."

These instructions the plaintiffs assigned for error.

The defendants, in addition to their assignments of error on the rulings on evidence, assigned fifteen errors to the instructions of the court, which were not noticed by the court on account of informality, and are therefore not stated.

The verdict was "in favor of the plaintiffs for one-half of the undivided tract of the James Trembel tract, lying in Butler town-ship, sold by Joseph Mitchell to Sarah A. Cochran, and the remainder in dispute in favor of the defendants."

*J. W. Ryon* and *J. Hoffman* (with whom was *E. G. Scott*), for plaintiffs below, referred to City *v.* Miller, 13 Wright 440; Acts of March 13th 1815, 6 Sm. L. 299; 17th April 1795, 3 Dall. L. 745; April 11th 1799, 6 Bioren 67; 3d April 1804, Purd. 527; McCall *v.* Lorimer, 4 Watts 353; Acts of 1700, 1 Bradford's Prov. L. 45; February 22d 1718, 2 Id. 290; March 20th 1724, 1 Dall. L. 209, and note at 210; Stewart *v.* Shoen-felt, 13 S. & R. 360; Larimer *v.* McCall, 4 W. & S. 133; Strauch *v.* Shoemaker, 1 Id. 174; Burns *v.* Lyons, 4 Watts 363; Thomp-son *v.* Fisher, 6 W. & S. 520; Dunden *v.* Snodgrass, 6 Harris 151; Diamond Coal Co. *v.* Fisher, 7 Id. 267; Russell *v.* Werntz, 12 Id. 337; Laird *v.* Hiester, Id. 463; Miller *v.* Hale, 2 Casey 436; Woodside *v.* Wilson, 8 Id. 52; Cuttle *v.* Brockway, Id. 45; Collins *v.* Barclay, 7 Barr 67; McCoy *v.* Michew, 7 W. & S. 386; Dougherty *v.* Dickey, 4 Id. 147; Baird *v.* Cahoon, 5 Id. 540; Stephen *v.* Wells, 6 Watts 325; Halsey *v.* Blood, 5 Casey 319; Bubb *v.* Tompkins, 11 Wright 359; Cox *v.* Steiner, 4 Barr 13; Woodburn *v.* Wireman, 3 Casey 18; Thompson *v.* Breckinridge, 14 S. & R. 346; Arthur *v.* Smathers, 2 Wright 40.

*F. B. Gowen* and *J. Bannan*, for defendants below, referred to City *v.* Miller, Stewart *v.* Shoenfelt, Strauch *v.* Shoemaker, McCoy *v.* Michew, Collins *v.* Barclay, Russell *v.* Werntz, Laird *v.* Hiester, Miller *v.* Hale, Cutler *v.* Brockway, Thompson *v.* Fisher, Dunden *v.* Snodgrass, Woodside *v.* Wilson, Dougherty *v.* Dickey, Baird *v.* Cahoon, Halsey *v.* Blood, Bubb *v.* Tompkins, Diamond Coal Co. *v.* Fisher, Act of March 13th 1815, Arthur *v.* Smathers, *&c.;* Dunn *v.* Ralyea, 6 W. & S. 475; Luffborough *v.* Parker, 16 S. & R. 351; Morton *v.* Harris, 9 Watts 325; Hubley *v.* Keyser, 2 Pa. R. 496; Huston *v.* Foster, 1 Watts 477; Burns *v.* Lyon, 4 Id. 363; Harper *v.* McKeehan, 3 W. & S. 238; Col-

lins v. Barclay, 7 Barr 67; Rawle on Cov. for Title 341-5; 2
S. & R. 531; 10 Barr 531; Wilkins v. Anderson, 1 Jones 402,
408; Irwin v. Trego, 10 Harris 368; Huzzard v. Trego, 11
Casey 9; Peebles v. Reading, 8 S. & R. 495; Miller v. Cresson,
5 W. & S. 284; Meals v. Brandon, 4 Harris 220; Boggs v.
Varner, 6 W. & S. 469; Bracken v. Miller, 4 Id. 102; Act of
March 29th 1824, § —, Purd. 998, pl. 58, 8 Sm. L. 290.

The opinion of the court was delivered, January 7th 1868, by
Agnew, J.

### Lyman v. City.

The main and only important question in this writ of error,
is the same which was decided by us upon a former writ of
error in the same case, reported in 13 Wright 440. That case
was heard before three of the judges only, one of them (the
Chief Justice) dissenting. The last hearing was before a full
bench, and the same result reached by four of us, the Chief
Justice still dissenting. The simple question, stripped of all ver-
biage, was whether an assessment of 400 acres of land merely
made in a name wholly unknown to any title or possession, ever
connected with the land in suit, and without any other circum-
stance or means of identification to be found in any of the written
evidences of the assessment, is an assessment of the land in con-
troversy sufficient to support a sale of it for taxes. It was held
upon the former hearing, and we continue of that opinion, " that
a sale without description, circumstance or name, having any
known relation to the land is bad."

In consequence of the supposition that certain general expres-
sions in former cases, were intended to indicate the opinion of
this court that any sale would be supported, if by some inde-
pendent parol proof it could be shown that it was meant to assess
a particular tract; all the cases in the books were examined and
collated, and it was shown in the former opinion that in every one
there existed some element of identity in the assessment itself
leading to a knowledge of the land assessed. This element con-
sisted of a name connected with a title of some kind once existing
in connection with the land, or of a number or a known designa-
tion, an adjoiner, a settlement or some other circumstance to lead
to a knowledge of the land that was assessed. The case of Stewart
v. Schoenfelt, 13 S. & R. 360, so much insisted on in argument,
is no exception; and this is shown most clearly by Huston, J., in
Bratton v. Mitchell, 1 W. & S. 312. Authorities were also mul-
tiplied to show, that it had often been held that the land must be
in some wise identified from something appearing in the assess-
ment; and that the assessment of lands is a matter resting upon
the written evidence of it found or once actually existing in the
commissioners' office.

[Lyman *v.* City of Philadelphia.]

That it is the intention of the law that the assessing officers should ascertain the subject of an assessment, was shown from the acts of the legislature providing the mode of making the assessment, the notice and the proceeding to sell, and the right and manner of redemption ; and arose also from the reason and necessity of the thing : 1st. To enable the owner to perform his duty by paying his taxes, or to redeem if his land be sold for non-payment ; 2d. To enable the officer to ascertain the taxes of the citizen who offers to pay, and to receive them when offered—and in case of non-payment to enable him to sell the land and convey it by some available description in the deed he delivers, and in the bond he takes back for the purchase-money ; and 3d. To enable the purchaser to know what land he buys, and to secure him in the purchase of some known parcel of land. An assessment without this element, which leads to the identity of the thing sold, is as useless to the receiving or selling officer and the purchaser, as it is to the owner himself. Hence, the irrelevancy of the often repeated assertion, that the owner should take the consequences of his omission to return a proper description of his land ; and if he cannot find his land assessed, let him make an immediate return of it and pay the taxes, and thus save himself from injury. But how does this inform the officer what land is the subject of the indescriptive assessment, and what security does it give to the innocent purchaser ? It is gross dishonesty and injustice to the latter. He buys upon the presumed correctness of the official act, and then is left to discover, that he has obtained nothing but a shadow ; that the assessment was a myth and the sale an official sham, which had extracted his money from his pocket without an equivalent. The former opinion did not put the case upon the necessity of notice to the owner only, but upon the ground that the means of knowledge must exist for the protection of all parties concerned.

Calling the proceeding a matter *in rem* does not help the case. A thing to be a subject of a legal proceeding must have some means of ascertainment. If it be a movable, the officer may seize it to answer the process ; if it be immovable he must describe it by some name or circumstance connected with it, otherwise no one but himself knows what is the subject of the proceeding. Titles which should rest only in the breast of the officer making the levy, attachment or assessment, would be of all things the most transitory and uncertain. The official act must therefore afford some clue to the thing proceeded against. But what clue does an assessment of 400 acres of land furnish to a certain survey of 401 acres and 57 perches, among hundreds of 400 acre tracts in the same township and county ; or what clue does the name John Turnbull afford to a warrant in the name of James Trembel, without a single other circumstance to help out the

[Lyman *v.* City of Philadelphia.]

infirmity of the assessment ? To call proof in aid of this wholly vague and unknown thing, is simply to ask some one (be he commissioner, assessor or treasurer) to say that by John Turnbull he meant James Trembel, and by 400 acres he meant a certain 401 acres and 57 perches of land lying in a certain place. Such a title hangs on a breath and dies when it expires, and its only mission is to put men by the ears and to bequeath a legacy of strife, expense and trouble to the owner, the purchaser, and the state.

A laborious research has been made by counsel into the ancient legislation of the state to prove that while the law was very particular at one time in ascertaining the subjects of taxation, it became afterwards, towards the close of the last century, more loose. But the best answer is the Act of 1804 itself, which crowns the column so laboriously raised. In the 2d section it provided that " all *unseated* lands within this Commonwealth, held by individuals, companies or bodies corporate, either by improvement, warrant, patent or otherwise, shall, for the purpose of raising county rates or levies, be valued and assessed in the same manner as other property." Turning to the manner in which " other property" was valued and assessed, we find in the 7th section of the Act of 1799 that the assessors are required to make a just and perfect return of the names of all the taxable persons, and of all the taxable property mentioned in the 8th section of the act. The 8th section required the assessor to take an account of all the names and surnames of all the taxable inhabitants in their township, and of all the property therein enumerated, viz., all lands held by patent, warrant, location or improvement ; houses, lots of ground, grist-mills and various other kinds of mills specified ; all negroes and mulatto slaves ; all horses, mares, &c., above the age of four years ; all offices and posts of profit, &c. Now it is impossible to conceive of any adequate performance of this duty by the assessor without connecting the subjects of taxation with an ownership real or apparent. It would be no " perfect return" for the assessor to return so many " tracts of land," so many " mills" of each kind, so many " horses and cattle," without returning also the name of the supposed owner, or to return " an office or post of profit," without the name of the incumbent. Now by the very terms of the 2d section the same duty is to be performed as to the unseated lands " held by individuals, &c.," and it would be no execution of the duty to return them without the name of a real or apparent owner, or some specification which would tend to identify the land, which the tax officers had valued and assessed. On the contrary, the very 5th section of the Act of 1804, passed to prevent sales from being avoided by the assessor's mistake in the name of the real owner, presupposes his duty to return it in the name of some one he believes to be the true owner.

[Lyman *v.* City of Philadelphia.]

In the very nature of the thing an assessment implies that the thing is specifically returned for taxation, and this thing can be known only by something which tends to designate it, whether it be a name or a circumstance, or both. Without this nothing is really assessed, for it is the return which, by the very terms of the law, constitutes the evidence of the assessment; and this is a full and conclusive answer to the argument that by the terms of the Act of 1815 no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser. Affect his title to what? If nothing capable of identification be returned, what is to be affected? If no discoverable thing be returned, how can anything be sold? It is not irregularity, but the absence of anything to be sold. And if this subject can be supplied by evidence wholly *dehors* the assessment, what is to prevent fraud or perjury from applying it to my land or his, as well as to the particular tract for which a suit is brought? The guess can be made in one direction as well as in another.

It is not intended to repeat all that is contained in the former opinion. What has been said now answers all the errors assigned upon the question of designation. On this question the court below submitted to the jury the subject of the identity of the land assessed quite as favorably as the evidence warranted.; for when all the evidence was in, the case seems to have stood in little better position than it did before, when we said of it that the assessment several years before in the name of John Trembel (the warrantee's name being James Trembel) cannot be resorted to under a subsequent assessment in the name of John Turnbull, there being no other circumstance of identity.

As to the error assigned upon the question of redemption nothing need be said, as the verdict of the jury for the defendants for that part of the land lying in Mahanoy township was evidently not founded upon the redemption of 1840. Had it been, the redemption would have destroyed the title also which the plaintiffs claimed under the sale of 1836. It is evident that the jury found for the plaintiffs in favor of the tax sale of 1836, against the redemption of 1840, and against the defendant's claim to be an innocent purchaser, without notice of the prior unrecorded deed of Sarah A. Cochran.

The error assigned to the rejection of the evidence, recited in the first assignment of error, needs but little notice. The cross-examination of Pinkerton shows that he did not possess the knowledge of Hoff's general reputation for truth, requisite as a ground to enable him to give his own belief in Hoff's oath. He says, " I never heard it said he had a good reputation. I never heard his reputation spoken of. I have heard people say he has lied." A witness must state his own knowledge of another's general good

[Lyman v. City of Philadelphia.]

reputation before he will be permitted to say he would believe
him on oath, otherwise he has no legitimate foundation for his
belief.   In some of the states the secondary question as to belief
is not permitted at all.

Upon the whole case in the writ of error of Lyman v. The City,

The judgment must be affirmed.

## CITY v. LYMAN.

The first four assignments of error relate to the reception of
evidence bearing upon the question of the identity of the land
assessed in the name of John Turnbull.   All these offers were
made in the first stage of the cause while the plaintiffs were giving
in their evidence, and the objections appear to be all founded upon
the idea that the assessments of the four hundred acres in John
Turnbull's name was void.   But this was to ask the court to decide
the case in advance of the evidence.   In making out an actual
assessment of unseated land which has been sold for taxes, much
liberality has always been shown by the courts in receiving evi-
dence.   On the subject of assessments see the opinion in Wells v.
Smyth, from Clinton county, decided in March last, at Philadel-
phia, (5 P. F. Smith 159).   Therefore, books, documents and papers
from the commissioners' office, showing their proceedings in rela-
tion to the land alleged to have been assessed, have always been
received.   Until all the evidence bearing upon the question of
the assessment is in, it would be unsafe for the court to pronounce
upon its effect.

We are unable to perceive the relevancy of the rejected evi-
dence stated in the fifth assignment of error.   The payment of
the taxes subsequent to the sale would not affect a bonâ fide ven-
dee of the commissioners purchasing in ignorance of this fact.

The sixth, seventh and eighth errors relate to the alleged
redemption of the land by the city of Philadelphia in 1840.   The
evidence contained in the sixth and seventh was pertinent to the
question as to what lands were embraced within the redemption
and was properly admitted.   But the court erred in receiving in
evidence the paper or memorandum stated in the eighth assign-
ment.   F. P. Dewees had stated that Mr. Loeser, the former
attorney of the city, was dead, that he had searched among
Loeser's papers for a week or ten days, a great mass of papers
and in great confusion, found no papers filed under the head
" The City of Philadelphia," but found some he guessed belonged
to the city ; on being recalled he produced a paper, in the hand-
writing of Mr. Loeser, which he said he had found among a lot
of loose papers.   The paper itself is evidently a rough and imper-
fect draft, full of erasures.   One of the purposes for which it was
offered and admitted was to show the list of lands which the city
claimed had been sold.   The city having given in evidence the

[Lyman *v.* City of Philadelphia.]

preamble and resolution of the commissioners of the county passed the 29th of February 1840, authorizing the redemption by the city of all their lands in Schuylkill county for a certain sum, and the county treasurer's receipt dated March 7th 1840, for that sum, stated to be for the full amount of all the taxes charged upon the lands contained in a list of lands to which the receipt was appended, and the list to which it was thus appended being a full and accurate schedule of all the lands of the city, including the Brady, Scott and Grant tracts · underlying the Turnbull survey furnished by Mr. Loeser the agent of the city ; the obvious intention and effect of the unfinished paper found in Mr. Loeser's office, if received as a list of the only lands claimed by the city as sold for taxes, were to confine the intention of the city in redeeming to those lands only specified in this imperfect paper, and thereby to contradict the finished and perfect list upon which the parties finally acted and to which the receipt was appended. The language of the preamble and resolution of the commissioners and of the treasurer's receipt, taken in connection with the list of lands to which it was subjoined, evinced the intention of the city to redeem from all sales for taxes, made before that time, of the lands contained in the schedule to which the receipt referred. But if the redemption were confined to the lands mentioned in this abandoned paper, then it was obvious the tracts covering the Turnbull survey were not embraced. Clearly a loose and useless castaway, such as this paper was, a first attempt to gather together the property, the act of an agent laid away because it was ound to be imperfect and supplied by a more full and correct list, was not competent for the purpose of derogating from the entire and accurate list finally furnished by the same agent, upon which the parties had acted. The bonâ fide intention of the city to redeem all her lands was a vital element in the question of redemption : Dougherty *v.* Dickey, 4 W. & S. 146 ; Laird *v.* Heister, 12 Harris 453 ; Bubb *v.* Tompkins, 11 Wright 359. Of this the preamble and resolution, and the completed list of lands acted on and receipt in full, were potent evidence not to be blown away by such a paper as this, exhumed from the dust and rubbish of a dead attorney's office. The court erred therefore in receiving the paper for this purpose.

We discover no serious errors in the ninth and tenth assignments. All the other assignments from the eleventh to the twenty-fifth are informal and will not be noticed.

The judgment is therefore reversed in this writ of error of the City of Philadelphia to the judgment upon the verdict for the plaintiffs, and a *venire facias de novo* is awarded as to that part of the land described in the writ of ejectment which lies in Barry now Butler township.