Manby v. Voorhees, 27 N. M. 511

---

(No. 2582.   Dec. 3, 1921.)

---

(No. 2022.   Dec. 23, 1921.)

## MANBY ET AL. V. VOORHEES ET AL.

### SYLLABUS BY THE COURT.

(1)   While findings of a referee and of the trial court will not be disturbed where they are supported by substantial evidence, they are subject to review in this court when not so supported.                                     P. 514

(2)   The   act of February 1, 1858, appearing in Com. Laws,

1865, as chapter 73, §§ 1, 2, and as sections 1880, 1881, Comp. Laws 1884, interpreted and **held** thereunder that an uninterrupted occupancy of land adverse to the true owner, by one who has no title, not only defeated the title of the true owner, but also vested in such occupant a complete title.   P. 519

(3)   Recital of facts concerning the tax title involved.
P. 521

(4)   An assessment of land as "1649 acres at 33 1-3," without further description, is **held** to be an insufficient description to serve to identify the land within the requirement of section 25, chapter 22, Laws of 1899.      P. 523

(5)   Such defect in description is **held** to be a jurisdictional defect, and not avoided by the curative provisions of section 25, chapter 22, Laws 1899.           P. 525

(6)   A tax sale certificate, issued by a county collector covering an alleged tax sale by his predecessor in office, about which he has no knowledge, is void, and furnishes no basis for a subsequent tax deed.             P. 526

(7)   The assessment of land in the name of a deceased person is a defect which is cured by the statute above cited.
P. 527

Appeal from District Court, Taos County; Leib, Judge.

Action by A. R. Manby and others against A. C. Voorhees and others.   Judgment for plaintiffs, and defendants appeal.   Reversed and remanded with directions.

A. C. Voorhees, of Raton, for appellants.

N. B. Laughlin, of Santa Fé for appellees.

OPINION OF THE COURT.
PARKER, J.   The appellee, A. R. Manby, brought suit in the district court for Taos county against Daniel Martinez and others to quiet title to the Antonio Martinez land grant.   From a judgment in his favor the persons hereinafter named as appellants have perfected this appeal.

The complaint of appellee Manby alleged in substance that the lands within the Antonio Martinez grant were granted by Spanish authority in 1716 to Antonio Martinez and his heirs and assigns; that it

was confirmed in 1892, and patent therefor was issued by the United States in 1897; that appellee is the owner in fee simple of more than an undivided three-fourths interest in said grant; that defendants are the owners in fee simple of a fraction less than a one-fourth undivided interest in said grant, but as to the extent of the respective undivided interests of each defendant the appellee has no knowledge. The complainant further alleged that many of the named defendants, and other persons, resided upon the grant, and had used and occupied divers and sundry tracts therein allotted and segregated from the body of the estate or common lands of the grant, and that he did not desire to molest or disturb said persons, but desired the same set off by the court to the various owners shown to be entitled thereto by the proofs to be submitted in the case.

The appellant, Voorhees, filed an answer and cross-complaint. The answer denied the allegations of the complaint, except with respect to the confirmation of the grant and the ownership in fee by defendants of certain segregated tracts within the grant. By way of cross-bill he alleged, among other things:

"The defendant herein owns and holds the title in fee simple, and is in actual possession of that certain tract of land lying and being within the exterior boundary lines of the said Antonio Martinez land grant * * * and the said defendant, through his ancestors, their ancestors and predecessors in title, have occupied, held, and possessed the same for a period of more than 10 years prior to the filing of the said complaint * * * herein and the commencement of this action, and have held and occupied and possessed said tracts of land by virtue of conveyances, devises, and other assurances purporting to convey an estate, in such land in fee simple."

Here follows a description by metes and bounds of the land claimed.

The answer of appellee Manby to this part of the

cross-complaint alleges that the appellee denied that the said defendant either owns or holds the title in fee simple or otherwise, or that he is in actual possession of the lands and premises attempted to be described and set forth in paragraph 4 of his said cross-complaint, and further denied on information and belief that the said defendant, A. C. Voorhees, himself, through or by his grantors and predessors, has occupied, held, or possessed the said land for a period of more than 10 years prior to the filing of the complaint in this cause, and the commencement of this suit, or that the said defendant has occupied or possessed said tract of land, or any part thereof, under any conveyance purporting to convey the estate thereof in fee simple or otherwise.

The evidence was taken before a referee, who found that the proof failed to show that Jose R. Vigil or the Hadleys, predecessors in title of the appellant Voorhees, ever took possession of or exercised any control over the Hadley tract in any way whatsoever; that the land was vacant sagebrush land, and that possession thereof had always been in the heirs, successors, and assigns of Antonio Martinez, the original grantee of the grant. The trial court approved this finding of the referee, and one of the principal contentions in the case is that the referee and the court both erred in making this finding.

[1] In approaching a discussion of the proposition involved, we will assume of course that if there is any substantial evidence in the record supporting the findings of the referee and of the court they will not be disturbed. We have carefully examined the record, however, and find that both the referee and trial court were clearly in error in making this finding, and we conclude that the error intervened by reason of the confusion in the mind of the referee and the court as to the period of time within

which the adverse possession of appellant's prede-
cessors in title was maintained.   The evidence in-
troduced in behalf of appellant Voorhees shows with-
out contradiction that Vigil, one of his predeces-
sors in title, maintained exclusive possession of this
land from about 1861 or 1862 to about 1885 or 1887.
The testimony introduced on behalf of appellee in
regard to possession of this land was directed to a
time subsequent to 1885 or 1887.   Thus it appears
from the testimony of Gabina Duran de Vigil, widow
of appellant's predecessor in title, that she married
Vigil about 1861.   The land was purchased by Vigil
from his brothers, his brother-in-law, and his moth-
er.   The year of Vigil's death he planted the land to
crops.   Vigil was in possession from 1881 until he
sold the land.   In 1881 he had deeds for the prop-
erty.   Witness and Vigil lived both at Taos and at
Desmontes on the land, in a house which in 1881
appeared to be rather new.   When the witness and
Vigil married he showed her deeds for the land, as
well as the boundaries of the land, which included
the tract in question.   On cross-examination witness
said she and Vigil moved each summer to the land
in controversy, and cultivated it, and when they
were not on the land they had tenants there.   The
land was unfenced.   Water for irrigation purposes
came from Arroyo Hondo.   The house was near the
Canyon Sandias, and contained two rooms and a hall.

The witness McClure testified that he purchased
part of the land from Vigil in 1894 and 1895.   The
land was surveyed in 1887, at which time witness
went around most of the tract with Vigil.   Vigil ob-
tained most of the land by purchase.   Vigil told
witness that he (Vigil) had deeds for the property.
In 1877 Vigil was in possession of the land either
through himself or his tenants.   Vigil continued in
that possession until 1896.   Witness was not per-
sonally acquainted with the land in 1877.   When he

first saw the house on the land it was in ruins. On cross-examination he said Vigil died in 1898. Some of the Hadley tract was cultivated in small patches (date not given) ; it was unfenced. Vigil told the witness that the ditch coming from out of the Arroyo Hondo, and from which the land was irrigated, he (Vigil) saw built about 1809, when he was a very small boy herding sheep. Witness first saw the house in 1888, and it was in ruins then. No improvements on the land since 1887, and no one has lived on it since that time. In 1898 witness permitted Vigil to farm his (witness's) part of the land, and Vigil pitched his tent on the land preparatory to farming it, but died before the seed had been sown.

Vincente Mares testified that he knew Vigil from about 1865 to his death. In 1874 the witness passed the Vigil house and saw him there farming the land. The house looked old at that time.

F. A. Gallegos testified that he knew that Vigil claimed the land in 1881. At that time the house upon the land was old.

Jose M. Santisteven testified that he knew Jose R. Vigil, and that he claimed the land in dispute. The father of the witness told him that Vigil used to live at Desmontes, but witness never saw Vigil there. There was a house and some corrals on the land about 1881, at which time such improvements were old. The land was surveyed in 1888. Vigil said the land was 1,000 varas wide, running from Desmontes to Rio Seco, but that it did not run through the Rio Seco creek at all. For 15 or 20 years the witness saw tenants of Vigil cultivating the land on shares for Vigil (prior to 1888). On cross-examination he said he knew only by hearsay

that people were planting the land for Vigil on shares.

Donaciano Duran testified that he knew that Vigil claimed the land for more than 30 years. Saw Vigil on the land. When asked how long ago that had been, he said for over 40 years that he knew of. Vigil planted the land and rented it on shares, and had many head of stock on the land. Did not know when Vigil discontinued farming the land. On cross-examination he said he did not know the quantity of land cultivated by Vigil.

Smith A. Simpson testified:

He came to Taos in 1859, and knew Vigil. Vigil lived on the land in 1861 and 1862 with his family and peons. He was farming the land, and "he had the finest piece of wheat land that I ever saw in Taos county."

"Q. Do you know of your own knowledge of his farming the land continuously either by himself or tenants? A. Oh, I think he farmed; I am certain he farmed it after I came out of the service in 1866, from 1866 on. He had some parties on the land, one by the name of Maes that lived with him; that was in 1870 or after 1870.

"Q. Now can you recall any other time that you were there or passed by there, A. Oh, yes, a number of times we passed there.

"Q. State whether or not you recall at any time seeing crops growing on that tract of land. A. In fact all of the tract of land in Desmontes was under cultivation. The reason I noticed this crop was he took me on the top of his house and showed me off toward the south. He said that was 'my wheat field.' It looked to me as though there was 80 to 100 acres. He said it was all his. He was always selling (wheat) to Mr. St. Vrain, the miller, and others would go to him to buy his crop. It came to considerable money. It was a very big crop of wheat. It made a big field if all he showed me was his."

On cross-examination:

"Vigil had woodyard and corrals there."

On behalf of appellee, Manby, he testified that he was acquainted with tract since 1885, and only a

small portion of the tract was cultivated, and that was at the upper end, the balance being sagebrush land, and that the land since that time had not been occupied by any one.

Enrique Gonzales testified no improvements on the land, except the Vigil house. On cross-examination: Heard that Vigil lived on the land, but never saw him on the land.

T. P. Martin testified that he knew the Vigil land from 1889, and it had never been in cultivation since that time.

Lauriano Garcia testified: Knew the house where Vigil lived many years, but no one lived there now. The land was cultivated some years ago, but not since 1885. The house stands in the middle of what was the cultivated land. Vigil claimed the property.

This evidence, while not as exact as to date and as to the manner and extent of possession by Vigil as could be desired, indubitably establishes the fact that long prior to 1885 Vigil had placed this land under his control and asserted title to it. It establishes a consecutive 10-year period of possession and dominion by Vigil antedating the year 1880, and it is of importance to note that none of the testimony of the appellee conflicts with such evidence offered by the appellant. Appellee's evidence is all directed to a time subsequent to 1880, at which time Vigil had consummated the exclusive right to the property by virtue of more than 10 years preceding possession. The referee failed to appreciate the importance of this evidence, or its relation to the evidence introduced by the appellee, and, there being no substantial evidence to support his finding that Vigil did not have the requisite possession, the find-

ing cannot be sustained on this appeal. Pueblo of Nambe v. Romero, 10 N. M. 58, 61 Pac. 122.

[2] It is to be observed that appellant, Voorhees, in his cross-complaint alleged his rights in the alternative, that is, that he had title by possession, and that he had title by possession under color of title. That his allegations were so treated by the appellee appears from his answer, in which he so treats the cross-complaint. It becomes, therefore, immaterial whether appellant showed color of title or not, if he did, in fact, show possession sufficient, as the statute then stood, to ripen into title. The statute in force during all the time that appellant's predecessor in title, Vigil was in the occupancy of the land in question was the act of February 1, 1858, appearing in the Compiled Laws of 1865 as chapter 73, §§ 1, 2, and appearing, unchanged, in the Compiled Laws of 1884 as sections 1880 and 1881. This statute has been twice construed by the Supreme Court of the United States during the time we were a territory in the cases of Probst v. Presbyterian Church, 129 U. S. 182, 9 Sup. Ct. 263, 32 L. Ed. 642, and Maxwell Land Grant Co. v. Dawson, 151 U. S. 586, 14 Sup. Ct. 458, 38 L. Ed. 279, upon appeal from the Supreme Court of the territory.

In the Probst Case, the Supreme Court of the United States, in interpreting this statute, said:

"Nor is it necessary that the defendant shall have a paper title under which he claims possession. It is sufficient that he asserts ownership of the land, and that this assertion is accompanied by uninterrupted possession. It is this which constitutes adverse possession, claiming himself to be the owner of the land. This is a claim adverse to everybody else, and the possession is adverse when it is held under this claim of ownership, whether that ownership depends upon a written instrument, inheritance, a deed, or even an instrument which may not convey all the lands in controversy. If defendant asserts his right to own the land in dispute, asserts his right to the possession, and his possession is ad-

verse and uninterrupted, it constitutes a bar which the statute intended to give to the defendant."

The court held in that case that it was error to refuse an instruction as follows:

"That an uninterrupted occupancy of land by a person who has in fact no title thereto, for the period of 10 years adversely to the true owner, operates to extinguish the title of the true owner thereto, and vests the right to the premises absolutely in the occupier."

In the Maxwell Land Grant Case, the court said:

"Plaintiff also complained of the instruction of the court upon the subject of the statute of limitation, namely, that if the plaintiff permitted defendant to take possession of the tract, claiming all of it as his own, and to continue such possession adversely under such claim of title for an uninterrupted period of 10 years or more, such possession would ripen into a right and title in the defendant, and forever afterwards prevent the plaintiff from taking possession of the property. We think, however, the instruction complained of was justified by the language of the statute, which provides (Comp. L. New Mexico of 1884, § 1881) that 'no person, or persons, nor their children, or heirs, shall have, sue, or maintain any action, or suit, either in law or in equity, for any land * * * but within ten years next after his, her, or their right to commence * * * such suit shall have * * * accrued, and that all suits * * * shall be had and sued within ten years next after the title or cause of action, or suits, accrued or fallen, and at no time after the ten years shall have passed.' Under similar statutes it has been held by this court that the lapse of time not only bars the remedy, but extinguishes the right, and vests a complete title in the adverse holder."

The court cites the Probst Case and other cases.

While the decisions of the Supreme Court of the United States upon such a matter are not binding upon this court, the two decisions referred to were, at the time they were rendered, binding upon the territory, and we see no reason, either upon principle, or as a matter of authority, to now depart from the conclusions reached by the Supreme Court of the United States.

It follows from the foregoing that the appellant

Voorhees, having shown occupancy and dominion under a claim of right adverse to the true owner by his predecessor in title for more than 10 years prior to the bringing of this suit, showed sufficient, not only to defeat the appellee in his recovery, but also showed sufficient to establish title in himself to the land in controversy.

[3] The appellant Voorhees in his cross-complaint alleged that the treasurer of the county of Taos had made, executed, and delivered to one William M. Frayne a certain tax deed dated September 6, 1905, covering the property in question, and that said deed was void and of no effect, and constituted a cloud upon appellant's title, and he prayed that the same be set aside and removed. The referee and the court below found that the tax proceedings were in all respects regular and valid. It appears by way of recital in the deed that the property on May 17, 1900, February 17, 1901, and February 17, 1902, was sold to the county. Likewise it so appears that on April 6, 1905, the property was again sold to the county for delinquent taxes for the years 1898, 1899, 1900, 1901, 1902, and 1903; that one Frayne paid to the collector the taxes, penalties, interest, and costs due, and in consideration thereof the then collector issued to him tax sale certificates (styling them certificates of purchase) Nos. 713, 714, 715 and 960, on August 17, 1905. It appears from the proofs in the case that certificate No. 960 was dated August 17, 1905, and was for the 1903 taxes, and that there was redemption by appellant's predecessors in title within 3 years after the sale. Certificate No. 715 was for the years 1898, 1899, and 1900 and was likewise dated August 17, 1905. The stub of the certificate recited that it was for the years 1898, 1899 and 1900, and that the dates of the sales for which the certificate was issued were May 17, 1900, February 17, 1901, and February 17,

1902. The stub contains the following remarkable recital:

"This certificate not having been made by De Cordova and Ygenio Sanchez, then collectors and ex-officio treasurers at the time of the above-mentioned sales of this property for said years, therefore, I have issued this certificate of sale this 17th day of August, 1905, and assigned the same to William M. Frayne, by paying the full face value and interest as follows: Here follows the figures showing the compilation of the amount due.) Recorded this 18th day of August, 1905, in Book 2, at page 409, of the Record of Sales, reported by collector October 6, 1905. Alex Gusdorf, Chairman."

Certificate No. 713 is for the taxes of the year 1901 and was likewise issued and sold to Frayne on August 17, 1905. Certificate No. 714 was for the taxes of the year 1903, and it was testified by one of the witnesses that it was dated March 17, 1904.

It appears from the evidence in the case that there is no record in the collector's book of sales, or elsewhere, containing the date of the sales and description of the property sold and the name of the purchasers and amount for which the same was sold, as is required by section 23, chapter 22, Laws 1899. It was attempted to be shown by a witness introduced on behalf of appellee that, as a matter of fact, tax sales of this property were held. He testified that notices of the tax sales were published, but no proof of such publication could be produced from the collector's office or elsewhere. The witness testified that he was sure that it was published, and that he was deputy collector covering most of this period, and knew as a matter of fact that the sales were made in accordance with the notices.

The tax rolls of the county shown in evidence disclosed assessments in the name of Mary C. Hadley or Mrs. O. A. Hadley from 1898 to 1907, inclusive. There was no description whatever of the property in the assessments of 1898 and 1899. The assess-

ments for 1900 to 1902, inclusive, described the property as "1643" or "1649 acres at 33 1-3 cents per acre," without further description. The assessments for 1903 refers for description to "Book A13, pp. 63 and 64, Taos Co. Records," and describes the property as 1,649 acres at 33 1-3. The assessments for 1904, 1905, and 1906 were identical with those for 1903. The 1907 roll showed a re-assessment for the years 1898 to 1902, inclusive, and for 1904 to 1907, inclusive, in the name of Mary C. Hadley, with a full and complete description of the property according to a detailed survey, with total taxes of $163.23, and the payment thereof by her heirs in full.

It is to be observed that the assessments for 1903, 1904, 1905, and 1906 referred to a certain book and page of the Taos county records for a description of the property assessed. It will not be necessary, however, for us to consider whether this is a compliance with the requirements of the statute as to the description of the property in the assessment for taxation, for the reason that the property was redeemed from the tax sale of April 6, 1905, for the taxes of 1903 within 3 years after the date of such sale, and for the further reason that the taxes for the years 1904, 1905, and 1906 are shown to have been paid by Frayne or Manby as owners of the property.

[4 ] We have then the question as to whether the description in the assessment rolls from 1898 to 1902, inclusive, is sufficient to support any tax whatever. They have heretofore been referred to. For the first two years they contained no description whatever. For the three succeeding years the assessment is upon "1649 acres at 33 1-3." The statute, section 4032, C. L. 1897, required a description by legal subdivisions, or otherwise, sufficient to identify the land. This same requirement is carried for-

ward in section 25, chapter 22, Laws 1899. The provisions of the latter much quoted act are as follows:

"If such property is described in the assessment roll and delinquent tax list for any year by such description as will serve to identify the same, the sale of such property for taxes as provided in this act shall not be void, or set aside on account of any error or irregularity in listing the same upon such roll or list, either as to the name or names of the owner or owners thereof, or by reason of its being listed in the name of the wrong person; and no bill of review or other action attacking the title to any property sold at tax sale in accordance with this act shall be entertained by any court, nor shall such sale or title be invalidated by any proceedings except upon the ground that the taxes, penalties, interest and costs, had been paid before the sale, or that the property was not subject to taxation."

It is to be admitted that if the descriptions heretofore mentioned are sufficient to "serve to identify" the land, they are to be held sufficient in this regard for the purposes of this tax sale. But can it be said that the descriptions do serve to identify the land? Its location, aside from being in Taos county, is not mentioned. Its boundaries are not attempted to be defined. The precinct or precincts in which it lies are not named. It is not identified by name. We are compelled to hold that such a description does not serve to identify the land as the subject of taxation, and forms no legal basis for the assessment and levy of taxes. In so holding we desire to be rather cautious in laying down any hard and fast rule on the subject of necessary description of property for taxation. We appreciate the difficulty in this state in properly describing real estate, because of the fact that a large proportion of the property is held by metes and bounds rather than by government legal subdivisions, growing out of the fact of the large areas covered by Spanish and Mexican land grants. The fact remains, however, that some method of identification must be resorted to in such descriptions other than merely stating the number of

acres taxed.   That this is the general rule on this
subject, see Black on Tax Titles (2d Ed.) § 112; 1
Cooley on Taxation (3d Ed.) p. 740 et seq.   See, also
26 R. C. L. "Taxation," § 314; McClellan v. District
of Columbia, 18 D. C. (7 Mack.) 94; Bush's Heirs v.
Williams, Cooke (Tenn.) 360; Fed. Cas. No. 2,225;
Smith v. Cox, 115 Ala. 503, 22 South. 78; Thibodaux
v. Keller, 29, La. Ann. 508; Adams v. Larrabee, 46
Me. 516; Cogburn v. Hunt, 54 Miss. 675; Lyman v.
Philadelphia, 56 Pa. 488;Newcomb v. Franklin Town-
ship, 46 N. J. Law, 437; Palomares L. Co. v. Los
Angeles County, 146 Cal. 530, 80 Pac. 931; State
Finance Co. v. Mather, 15 N. D. 386, 109 N. W. 350,
11 Ann. Cas. 1112.

[5]   We have three times had before this court
the question of what are and what are not jurisdic-
tional defects in taxation proceedings under chapter
22, Laws 1899.   In Straus v. Foxworth, 16 N. M. 442,
117 Pac. 831, it was held that under section 25 of
chapter 22, Laws 1899, defects or irregularities in
the notice of sale were not jurisdictional and that
the restriction of defenses to tax sales to the fact
that the taxes had been paid, or the property was
not subject to taxation, was a valid exercise of leg-
islative power.   It was carefully noted, however, that
jurisdictional defects might always be taken advan-
tage of.

In Maxwell v. Page, 23 N. M. 356, 168 Pac. 492, 5
A. L. R. 155, we held that a premature sale was an
irregularity which was not available to the owner
in view of the restricted defenses reserved in the
statute.   In that case we said that:

"The essentials of taxation are the existence of the sub-
ject matter which is to be subjected to taxation, and its lia-
bility to the imposition of the tax, the assessing of the
property for taxation, and the levying of the tax thereon."

In that case the question was not, as it is here,

whether a tax sale had in fact been had, but whether the sale had been had at the time prescribed by the statute. We did not have before us in that case any question as to whether, if no sale in fact had been had, the defects in the proceedings would have been jurisdictional.

In Pace v. Wight, 25 N. M. 276, 181 Pac. 430, however, we had the identical question which is present in this case, i. e., whether the tax sale was in fact made is jurisdictional, and whether that fact can be established by anything except the book of sales, required by section 23, chapter 22, Laws 1899. In that case it was first held by us that the fact of actual sale for taxes was jurisdictional, and that, there being no legal evidence to that effect, the tax deed was void. On rehearing, however, it was made to appear that the tax sale was an admitted fact in the case, and consequently our holding became obiter. It was arrived at, however, by a unanimous court, and stands as the opinion of this court on the subject. In that case the former cases were collected, and we held in terms that the curative provisions of the statute did not apply to jurisdictional defects in tax proceedings. We now add to the foregoing list of defects which are jurisdictional, and which are not cured by the statute, that of failure of description sufficient to identify the land. This must necessarily be so. If you have no description, you have no subject-matter upon which the tax can be laid, and you have no property which can be conveyed to the purchaser.

[6] In the Pace-Wight case the collector, who was supposed to have made the tax sale, had failed to make the record in the book of sales, and had left no written memorandum or evidence of any kind of the fact that he had made the sale. His successor in office, without any personal knowledge of the

matter whatever, made the record show that a sale had in fact taken place some 2 years and 3 months prior to the entry on the record, a fact wholly without his knowledge, and which, if it had occurred, it was the duty of his predecessor to have recorded. We held that such an act by the successor of the collector who made the sale was void, and furnished no basis for the tax deed.

In the case at bar there is no official record whatever of the fact that the sales for taxes for the years 1898 to 1902, inclusive, were in fact ever made by the collector except perhaps for the year 1902. The collector in office in 1905 wrote up some tax sale certificates purporting to be based upon some supposed sales made by two of his predecessors in office. Concerning the truth of the fact that these sales were actually made, he could have had no knowledge, and did not pretend to have the same. For this reason alone the tax certificates issued by the collector in 1905 are within the doctrine of the Pace-Wight case, to which we adhere, and are wholly void and furnish no basis for the tax deed here in question.

There is language in the Pace-Wight case to the effect that the only evidence admissible under any circumstances of the fact that a sale for taxes was made is the official record to be kept by the collector. We have some doubt of the correctness of this broad statement. Circumstances might perhaps arise under which the fact of sale might be otherwise shown, and when such a state of facts is presented, we will endeavor to state a rule on the subject. As applied to the facts in that case, however, where a record was made by reciting facts, which the collector could not and did not know, the statement was correct.

[7] Appellant urges that all of the assessments for all of the years in question were void for the

reason that they were assessed in the name of a deceased person. It seems that Mary C. Hadley, or Mrs. O. A. Hadley, died in 1898, and that the property was continuously assessed in her name during the period in question. In view of the language of section 25, of the act of 1899, above quoted, we do not see how appellant can successfully urge this objection to this assessment. Names of taxpayers are deemed by the provisions of the act to be unimportant, the tax being laid upon the property. A literal interpretation of the words used would be sufficient to dispose of the contention made, and we therefore hold that it is not a jurisdictional defect for property to be assessed in the name of a deceased person. Upon this subject see Grant v. Bartholomew, 57 Neb. 673; 78 N. W. 314, 315; Holroyd v. Pumphrey, 18 How. 69, 15 L. Ed. 264; Young v. City of Marshall (Tex. Civ. App.) 199 S. W. 1180.

There are other appellants in the case claiming right to possession of certain tracts of land within the grant, but the evidence in support of their claims is so uncertain and undeveloped that the findings below with respect to them must be affirmed.

It follows from all of the foregoing that there is error in the decree of the district court as to the appellant Voorhees, and that the same should be reversed, and the cause remanded to the district court with directions to enter a decree in favor of the appellant quieting his title to the land in controversy; and, it is so ordered.

RAYNOLDS, C. J., concurs.

DAVIS, J., did not participate.