258 P.2d 734

**VEHN v. BERGMAN et al.**

No. 5569.

Supreme Court of New Mexico.

May 19, 1953.

Rehearing Denied July 25, 1953.

Henry E. Blattman, Las Vegas, Grantham & Spann, Albuquerque, for appellants.

C. L. Collins, Las Vegas, M. J. McGuinness, Albuquerque, for appellee.

COORS, Justice.

The controlling question in this case is whether substantial evidence supports the trial court's judgment in favor of the plaintiff, Ruby E. Vehn.

Mrs. Vehn and Edward P. O'Brien, deceased, were married October 2, 1941, and were divorced April 7, 1944. Under a property settlement entered into between Mr. O'Brien and the plaintiff, O'Brien took title to real estate at 510 N. Eleventh Street in Albuquerque, not involved in this controversy, and plaintiff became vested with title to the property here in question, an apartment building, at 422 N. Eleventh Street, Albuquerque. Subsequent to the divorce plaintiff went to Klamath Falls, Oregon, where she became interested in some property for sale there.

Plaintiff continued a close relationship with her former husband and during June, 1944, she communicated with him by telephone about her contemplated purchase of the Oregon property. He advised her not to buy until she had talked to him further about it. She came to Albuquerque and on June 30, 1944, mortgaged the property involved in this action to the First National Bank in Albuquerque as security for payment of a loan for $4,000, evidenced by a series of $500 notes which became payable at six month intervals.

Plaintiff testified at the trial in this case that on the evening of September 26, 1944, O'Brien suggested that plaintiff, who was recuperating at the time from a nervous breakdown, deed the property to him and that he told her that if she would do so he would pay off the loan and would hold the title as security for the loan, provided that in case appellee and O'Brien should sell it before either of them died, O'Brien would get his $4,000 and that she would have the balance of the purchase price. She further testified that if he died before she did, the property was to go back to her by his last will and testament, and that if plaintiff should die first, O'Brien was to retain title under the warranty deed which she executed to him in pursuance of this oral agreement. Whether there is corroborating evidence to support this alleged oral agreement is a crucial issue in this case.

Shortly after the foregoing events purportedly took place, plaintiff returned to Oregon where she lived until May 1, 1947, when she moved back to Albuquerque and took up residence in one of the apartments at 422 N. Eleventh Street. On June 6, 1948, she married Ralph E. Vehn, and after this marriage continued to reside in the same apartment until the date of this trial.

Cross-examination of the plaintiff disclosed among other things that while she contended that O'Brien held legal title to the property at 422 N. Eleventh Street merely as security, all improvements and repairs made on the property were paid for by O'Brien, as well as the taxes. O'Brien in his income tax returns reported the rentals as part of his income, depreciated the property and took deductions for expenses and improvements. The plaintiff, on the other hand, did not report any of the rentals as her income. Plaintiff, furthermore, paid $40 per month as rent for the apartment which she occupied. Though occupants of other dwelling units in the apartment house paid $75 a month there are indications that plaintiff's apartment was not worth as high a rental and furthermore that she looked after the apartments, collected the rents and deposited the moneys to O'Brien's account. An account book which was the property of O'Brien also showed payments made to plaintiff's husband, Ralph Vehn, for carpentry work in and about the premises. A canceled check dated May 23, 1950, in the amount of $350 payable to plaintiff, was introduced in evidence, representing payment of a balance due plaintiff for labor, painting, papering, materials, repairs, etc. O'Brien stayed at the apartments in the winter time for several winters but paid no rent, according to plaintiff's testimony.

Several witnesses were placed on the stand for the purpose of corroborating plaintiff's testimony. A tenant in one of the apartments, Mrs. A. R. Tarburton, who met and spoke to O'Brien on several occasions, testified thus:

"Q. The conclusion you came to was that Mr. O'Brien treated this property as the property of Mrs. Vehn? A. That is before he left and he very definitely stated that—he said to me that the place was hers.

"Q. Very definitely? A. That is what I took in from the statement he made, I don't know."

This is perhaps the strongest testimony tending in plaintiff's favor. One may well gather, however, that the witness was not very sure of herself in making the statement as to ownership and as to what O'Brien meant by saying it. The statement is not necessarily inconsistent with an intention on O'Brien's part to leave the property to Mrs. Vehn by will. The testimony is further weakened by the witness' own testimony at another point to the effect that "the place was hers (Mrs. Vehn's) to take care of." The testamentary character of the statements made by O'Brien is also reflected in the testimony offered by Mr. Tarburton to the effect that from things Mr. O'Brien said "he assumed Mr. O'Brien was the owner but that it was to be Mrs. Vehn's when he died."

Mr. Tarburton further testified with respect to his conversations with O'Brien and the latter's relationship with plaintiff as follows:

"Q. When you talked to him at any time, did he ever mention his wife, Ruby? A. Oh, yes, quite a few times.

"Q. What did he say about his wife? A. Well, on two different occasions, he brought up the subject of property —in one particular time—talked about a tree in the front—had a dead limb on it—talking about that tree, how to remove it, he said: It doesn't make any difference to him—what they did to the tree. When he was gone it would be Ruby's and Mr. Vehn—Ralph, he called him. That is about all he said about it.

"Q. Did he tell you that on more than one occasion? A. Yes, sir.

"Q. You then understood from the —he told you that the property belonged to Mrs. Vehn? A. It would be, the property, after he died—that is the impression. * * *

"Q. That it would be her property after he—if he died? A. Yes, Sir."
Charles H. Stearns, who likewise appeared for plaintiff, testified as follows:

"Q. While Mr. O'Brien was living, did you have any talks with him when (with?) reference to property affairs?

A. During the years he owned the property, I got acquainted with him * * * We would visit on the sidewalk. That was the extent of our acquaintance during the years—a social chat occasionally.

"Q. In the course of those conversations you had with Mr. O'Brien, did he mention anything about his property and particularly about this at 422 North 11th Street? A. I recall that I had a friend one time looking for an apartment and asked Mr. O'Brien if he—at that time there was a vacancy—if he wanted to rent it. He said that he would. He always consulted his former wife * * * the last time I talked to him—well, I said: 'Can I be of any help to you in any way about your property?' 'No,' he said 'Ruby is taking care of it—he said—I consider it her's, there is nothing more we can do.' * * *"

Finally, Hugh A. Trainer, who was interested in buying the property, testified:

"A. Allright, if you figure on kind of straightening things up, if you would like to sell this property, I am in the market to buy it.

"Q. What piece of property is that, Mr. Trainer? A. 422 North 11th— North Eleventh Street. He said: 'No, this property Ruby wants it and it belongs to Ruby and I want her to have

it.' I couldn't even get a sale price of any kind. He wouldn't talk sale. He said: 'It is hers, she takes care of it and everything.' "

Later on, the witness Trainer testified to a conversation with O'Brien immediately after the death of Levita Judd, O'Brien's stepdaughter, when O'Brien indicated it would be necessary to change his will as a result of her death. He testified:

" * * * I said: 'Ed what about the house on 11th Street in Albuquerque, do you want to sell that?' 'That is Ruby's house' he told me 'If you want to, I would like to buy.' 'That house belongs to Ruby. It is hers. She wants it and I want her to have it.' He said. He went on to tell me about the will, stated he had nephews and nieces. * * * "

The glaring gap in all of this testimony is that it makes no reference to any contractual agreement, oral or otherwise, entered into between plaintiff and the deceased, on or about September 26, 1944, or at any other time. The testimony, on the other hand, is consistent with a situation which is substantially supported (in fact, there is scarcely a scintilla of testimony contra) that O'Brien treated the property as his own and that until shortly before his death he had probably included the plaintiff in his earlier will as devisee of the property in question.

A somewhat analogous situation to that in the instant case was before this Court in National Rubber Supply Co. v. Oleson & Exter, 1915, 20 N.M. 624, 151 P. 694, 696. In that case plaintiff brought action in replevin for certain bicycle tires held by defendant as administrator of Joseph A. Nadeau. The proof showed that on October 17, 1913, plaintiff's agent took an order from Joseph A. Nadeau for the property in question. The salesman's memorandum of the transaction showed merely that the property was sold to Nadeau and further said "ship January 1, via frt." The tires were sold by the administrator. Plaintiff contended that it was intended that title to the property should not pass to Nadeau until payment was made for a previous shipment of material and that testimony of the salesman on this point was corroborated by the written memorandum. Judgment was entered for plaintiff and an appeal taken. This court reversed, holding that the bill of sale did not constitute corroboration of the oral testimony. The court held that the contents of the memorandum were just as consistent with the theory that title should pass immediately upon receipt of the goods as that title should not pass until some prior condition had been performed by the purchaser. The court, speaking through Mr. Chief Justice Roberts, further stated:

" * * * The memorandum, standing alone and unsupported by the testi-

mony of the witness, would tend rather to support the theory that it was intended by the parties that the sale should be unconditional. * * * In order to satisfy the statute, the corroborating evidence must be such as would, standing alone and unsupported by the evidence of the claimant, tend to prove the essential allegation or issue raised by the pleadings."

In the instant case the testimony of the witnesses offered as corroboration would, standing alone, in no way support plaintiff's testimony with respect to the oral agreement. That testimony, standing alone, tends rather to support the theory that until toward the end of his life, O'Brien intended to devise the property to the plaintiff by will.

The testimony of the witnesses called for the defendants was definite in tending to show that O'Brien treated the property at 422 N. Eleventh Street as his own. These witnesses testified to statements by O'Brien that he wanted to sell the property so he could reinvest in San Diego, that he wanted to give his former wife first chance to buy it but that he wasn't going to wait any longer, that he was living on part of the income from the property, that it would pass to Mrs. Judd upon his death, that he hoped to sell it for $25,000, that plaintiff's sister was occupying one of the apartments and

that it was his property and he was going to get her out.

During the summer shortly before O'Brien's death, his stepdaughter, Mrs. Judd, died as result of an automobile accident. The evidence indicates that when a new will was made thereafter, five days before O'Brien's death, to dispose of the property which he had previously left to her, he left plaintiff, his former wife, out completely. The inescapable conclusion thus to be drawn from the testimony as a whole, assuming that plaintiff was named as a devisee in O'Brien's earlier will, is that O'Brien had changed his mind about leaving any property to his former wife during the last days of his life. There was some testimony to the effect that O'Brien had made a complete settlement with plaintiff and that he did not owe her one penny. Since a person has the inherent right to change his will, as long as he remains competent to do so, and since the decedent's competency is not here challenged, the first and, in view of our determination thereof, the only real issue to be resolved is whether there is any substantial legal evidence concerning the oral agreement of September 26, 1944.

While it is well established by numerous decisions that this Court will not reverse the trial court when its findings of fact are supported by substantial evidence, it has also been held, as recently as in

Southern Union Gas Co. v. Cantrell, 1952, 56 N.M. 184, 241 P.2d 1209, that all facts essential to the judgment found by the trial court must be so supported. In the case at bar numerous essential facts were offered by the plaintiff's own testimony, which pursuant to Section 20–205, New Mexico Statutes Annotated, 1941 Comp., the New Mexico version of a deadman's statute, must be corroborated by other material evidence. This is particularly the situation with respect to details of the oral agreement purportedly made between the plaintiff and the deceased on September 26, 1944, following which plaintiff conveyed the property at 422 N. Eleventh Street to the decedent by warranty deed on September 27. Nowhere is there any evidence, other than that of the plaintiff, which sets out the details of this purported oral agreement, and even the plaintiff's testimony is vague as to some of the details.

Section 20–205, New Mexico Statutes Annotated, 1941 Comp., requires corroboration in the terms following:

*"Transactions with decedent—Corroboration required.*—In a suit by or against the heirs, executors, administrators or assigns of a deceased person, an opposite or interested party to the suit shall not obtain a verdict, judgment or decision therein, on his own evidence, in respect of any matter occurring before the death of the deceased person, unless such evidence is corroborated by some other material evidence."

The effect of this statute is that, unless corroborated by other material evidence, the testimony offered by the party against whom the statute operates is not legal evidence at all. It follows that it cannot serve as substantial evidence.

In In re Cardoner's Estate, 1921, 27 N. M. 105, 196 P. 327, this Court faced a situation strikingly like the one considered herein. The plaintiff, an attorney, testified to an oral agreement between himself and the decedent to the effect that plaintiff had been retained by her during her lifetime at an agreed retainer of $3,500. Plaintiff sought to corroborate his testimony to meet the requirements of the statute, by introducing a power of attorney executed by the decedent appointing plaintiff her attorney in fact, with power to prosecute the legal business contemplated. We stated:

"* * * This power of attorney is evidence of the appointment of appellee as the attorney of the decedent, but in it nowhere is mentioned anything concerning the amount of compensation to be received by him, or the time and manner of payment thereof. This clearly is not corroboration of the fact that there was an agreed retainer of $3,500. * * * It thus appears that there was no corroboration of the vi-

tal fact necessary to sustain this judgment, namely, that the decedent employed the appellee and agreed to pay him $3,500 as a retainer. The proof of that fact rests solely on appellee's testimony."

After reviewing previous cases before this Court involving the question of corroboration under this section of the statutes, we said:

"* * * The corroboration required is not the general corroboration of the witness as to his credibility, but it is *some form of evidence which tends, in and of itself, to establish the essential fact necessary to a recovery*. This may be done circumstantially in case direct evidence is not available, as we held in the Union Land & Grazing Co. Case [Union Land & Grazing Co. v. Arce, 1915, 21 N.M. 115, 152 P. 1143]. But in the case at bar not a single word of testimony and not a single line of written evidence reaches the essential point necessary for the plaintiff to recover, 'namely, Did the decedent contract with him for a retainer of $3,500?" (Emphasis ours.)

In Childers v. Hubbell, 1910, 15 N.M. 450, 110 P. 1051, in like manner, the proffered testimony failed to tie up the essential fact sought to be corroborated with an alleged oral agreement. Plaintiff there sought to recover the money paid, laid out and expended for the use of the decedent. The plaintiff held two unpaid checks of the decedent covering the amount sued for, and it was claimed that these checks in themselves amounted to corroboration of plaintiff's own testimony that he had paid at the instance of the decedent, the sum of money represented by the checks. This court concluded that the testimony was entirely insufficient by way of corroboration.

■■ Substantial legal evidence, adopting the phraseology of the Union Land & Grazing Co. case, supra, thus is lacking in the case at bar upon the essential point necessary for plaintiff to prevail, namely, that on or about September 27, 1944, only the bare legal title to the property at 422 N. Eleventh Street was conveyed to the decedent as part of a security transaction and that the equitable title remained at all times in the plaintiff. Without such corroboration, plaintiff's testimony has no force or effect. Craig v. Cox, 56 N.M. 658, 659, 248 P.2d 659; Gillespie v. O'Neil, 1934, 38 N. M. 141, 28 P.2d 1040; Gildersleeve v. Atkinson, 1891, 6 N.M. 250, 27 P. 477. It follows that the trial court's findings of fact which vested the equitable title in the plaintiff are unsupported by substantial evidence. Findings of fact which are not so supported cannot be sustained on appeal, and a judgment based on such findings is itself without support. Manby v. Voorhees, 1921, 27 N.M. 511, 203 P. 543; Epstein v.

Waas, 1923, 28 N.M. 608, 216 P. 506; Jones v. Jernigan, 1924, 29 N.M. 399, 223 P. 100; Salas v. Olmos, 1943, 47 N.M. 409, 143 P. 2d 871; Bland v. Greenfield Gin Co., 1944, 48 N.M. 166, 146 P.2d 878; De Baca v. Kahn, 1945, 49 N.M. 225, 161 P.2d 630; Southern Union Gas Co. v. Cantrell, supra.

There is in many respects a striking analogy between the facts in this case and those in Manby v. Voorhees, supra. That was a quiet title action wherein title of the appellant, the original defendant in the action, was based upon the priority of title of one Vigil. Evidence had been taken on behalf of the trial court before a referee, who found that the proofs failed to show that Vigil or his successors in title ever took possession of or exercised any control over the land. The trial court approved this finding of the referee. The Supreme Court noted, however, in reviewing the record, that there was considerable evidence, which, while not as exact as to date and as to manner and extent of possession by Vigil as could be desired, established the fact that long prior to the date in controversy, Vigil had placed the land under his control and asserted title to it, establishing a consecutive 10-year period of possession and dominion in Vigil. The court observed that the referee had failed to appreciate that appellee's evidence which was hoped would cancel out appellant's evidence, was all directed to a time subsequent to 1880, at which time Vigil had already consummated the exclusive right to the property by virtue of more than ten years previous possession. Thus, this Court concluded, there was really no substantial evidence to support referee's finding that Vigil did not have the requisite possession, and the finding of the referee and the trial court could not be sustained on appeal.

■ Though we have declared the principle on previous occasions, it bears repetition now, the corroborating evidence itself must be such as would, standing alone and unsupported by the evidence of the claimant, tend to prove the essential allegation or issue necessary to be resolved in claimant's favor in order to support a recovery. National Rubber Supply Co. v. Oleson, supra; Evans v. Evans, 1940, 44 N.M. 223, 101 P.2d 179. Since there is no corroboration of plaintiff's testimony as to the nature and details of essential elements of the oral agreement with the decedent in the instant case, there is no substantial evidence to support these facts necessary to plaintiff's recovery. It follows that the findings of the trial court on which plaintiff's right to ownership must be based cannot be sustained on this appeal.

■ In event an oral agreement such as contended for by the plaintiff and appellee in this case had been duly established relief at law would not be possible because the transaction was clearly within the stat-

ute of frauds. Though equitable relief might not thereby be precluded, a matter which we do not herein decide, where as here the oral agreement itself is not supported by substantial evidence, there is no basis upon which even a court of equity can grant relief.

The judgment of the trial court is hereby reversed, with directions to the trial court to enter judgment for the appellant and to take such other action as is not inconsistent herewith.

It is so ordered.

SADLER, C. J., and McGHEE, COMPTON and LUJAN, JJ., concur.